UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                :

VIROGEX INC.,                       :

                                :

             Plaintiff,           :

                                :           26-cv-3179 (LJL)

       -v-                    :

                                :       OPINION AND ORDER

RESOLVX HEALTH INC., et al.,       :

                                :

             Defendants.        :

                                :
-------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  05/14/2026

LEWIS J. LIMAN, United States District Judge:

Plaintiff Virogex, Inc. ("Virogex") moves for a preliminary injunction against Defendants ResolvX Health Inc. ("ResolvX") and Vas Leonidov ("Leonidov," and collectively with ResolvX, "Defendants").  Dkt. Nos. 7, 19.  Virogex seeks an order preliminarily enjoining the Defendants from "manufacturing, importing, exporting, advertising, promoting, distributing, displaying, offering for sale, or selling or otherwise dealing in products bearing the word and/or design marks for PETMECTIN, PETDAZOLE, FISHCYCLINE, FLAV-X, VIR-X, as well as the word and design marks associated with Plaintiff's Virex Health brand and the word mark "Virogex."  Dkt. No. 36.  Plaintiff also seeks to enjoin Defendants from "engaging in conduct intended to direct consumer traffic away from Plaintiff's website at the domain virex.health, to Defendants' website at the domain resolvx.health," including by "claiming Virogex's products are inauthentic" or "fake."  *Id.*  Finally, Plaintiff seeks injunctive relief prohibiting Defendants from "representing to the public that either ResolvX or its products have any association or affiliation with, sponsorship by, and/or connection with Virogex" or "Virex Health," and against any person knowing, instructing, or aiding in the above.  *Id.*  Defendants oppose the motion. Dkt. Nos. 16, 26.

This Opinion and Order sets forth the Court's findings of fact and conclusions of law for the purposes of Federal Rule of Civil Procedure 52(a)(1).  To the extent any statement labeled as a finding of fact is a conclusion of law, it shall be deemed a conclusion of law, and vice versa. For the following reasons, the motion for a preliminary injunction is granted in part and denied in part.

**FACTUAL FINDINGS**

"On a motion for a preliminary injunction, 'if essential facts are in dispute, there must be a hearing . . . and appropriate findings of fact must be made.'"  *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Stucco Sys., LLC*, 289 F. Supp. 3d 457, 463 (S.D.N.Y. 2018) (quoting *Republic of Philippines v. N.Y. Land Co.*, 852 F.2d 33, 37 (2d Cir. 1988)).  After the evidentiary hearing is conducted, pursuant to Federal Rules of Civil Procedure 52(a) and 65(d), the Court is required to set forth the findings of fact and conclusions of law which support its order.  *Republic of Philippines*, 852 F.2d at 37.

The hearing record consists of the following:

(1) The sworn declarations of Sidney Belzberg, dated April 16, 2026, and of Alicia Belzberg, dated April 26, 2026.  Dkt. Nos. 7-16 (the "Sydney Decl."), 19 (the "Alicia Decl.");

(2) Two sworn declarations of Vas Leonidov, dated April 21, 2026, and May 1, 2026. Dkt. Nos. 16 (the "First Leonidov Decl."), 26-1 (the "Second Leonidov Decl.");

(3) Sworn declarations of Daniel Ansari, dated April 30, 3036, Dkt. No. 26-2 (the "Ansari Decl."); Paul Yates, dated April 29, 2026, Dkt. No. 26-3 (the "Yates Decl."); and of Dr. Paul Alexander, dated April 29, 2026, Dkt. No. 26-4 (the "Alexander Decl.");

(4) The exhibits attached to the declaration of Gabriel Altman.  Dkt. No. 7.

The Court conducted an evidentiary hearing on May 6, 2026.  The following witnesses testified : Sidney Belzberg, Alicia Belzberg, Vas Leonidov, Paul Yates, and Daniel Ansari.  The Court received the direct testimony of the witnesses through the declarations sworn to by them before the hearing.  Each witness was subject to cross-examination and the opportunity for redirect examination with the exception of Dr. Paul Alexander who was not available to testify; Plaintiff waived cross examination of Dr. Alexander.  Tr. at 117:22–118:7.[1]  The Court also received the following memoranda of law: Plaintiff's Memorandum of Law in Support of Motion for Temporary Restraining Order and Preliminary Injunction, Dkt. No. 7-31, Defendants' Memorandum of Law in Opposition to Plaintiff's Application for a Temporary Restraining Order and Preliminary Injunction, Dkt. No. 15, Plaintiff's Supplemental Memorandum of Law in Further Support of Motion for Preliminary Injunction, Dkt. No. 19-17, Defendants' Supplemental Memorandum of Law in Opposition to Plaintiff's Application for a Preliminary Injunction, Dkt. No. 26, and Plaintiff's response to the supplemental opposition memorandum, Dkt. No. 24.

## I.       The Relevant Parties

Virogex is a Delaware C corporation incorporated on September 22, 2020.  *See* Dkt. No. 19-1 (certificate of incorporation); Sidney Decl. ¶ 3; First Leonidov Decl. ¶ 2.  Virogex was formed for the purpose of developing, importing, marketing, and selling various nutritional supplements and pet products globally, to be sold online.  Sidney Decl. ¶ 6.

ResolvX Health Inc. is a New Hampshire corporation formed in 2025.  Sydney Decl. ¶ 45.

---

[1] Sidney and Alicia Belzberg were sequestered so that Sidney Belzberg did not hear Alicia Belzberg's testimony before he was called to testify.  Because he is a party, Leonidov was not sequestered and was able to hear the testimony of both Sidney and Alicia Belzberg before he testified.

Sidney and Alicia Belzberg are a married couple who founded Virogex in 2020.  Sidney has a degree in molecular biology and is the former Chief Executive Officer of Belzberg Technologies, which he testified was the inventor of the first electronic traded fund.  Tr. at 71:4–18.

Leonidov is an individual who resides in New Hampshire.  He is a co-founder of Virogex.  First Leonidov Decl. ¶ 2.

Ansari is an IT consultant and website developer.  He performed technical, web development, e-commerce, and IT support work for Virogex and now performs such work for ResolvX.  Ansari Decl. ¶ 3; Tr.

Yates is a New Hampshire resident who ran the fulfillment center for Virogex.  Tr. at 180:12–16.  Since approximately December 2025, he has been responsible for fulfillment operations for ResolvX.  Yates Decl. ¶ 2.

## II.    Virogex's Founding and Business

Virogex was founded by Sidney and Alicia Belzberg and by Leonidov originally to sell nutritional supplements for pets online.  The initial capital for Virogex was contributed by Alicia Belzberg who invested $11,000 in the company.  Alicia Decl. ¶ 5; Dkt. No. 19-7 (bank record detailing investment).  Leonidov was offered the opportunity to invest in the company, but declined.  Alicia Decl. ¶ 5; Tr. at 41:15–18.  At the time of the company's formation, Leonidov was installed as the sole Director, President, Secretary, and Treasurer of Virogex.  Sidney Decl. ¶ 9; First Leonidov Decl. ¶ 2; Dkt. No. 16-3 at 2 (the "Incorporator Initial Resolutions" naming Leonidov to the aforementioned positions).[2]  As President, Treasurer, Secretary, and Director of Virogex, Leonidov was the sole signatory on Virogex's bank account.  First Leonidov Decl. ¶ 5.

---

[2] The Incorporator Initial Resolutions are signed by the registered agent of Virogex as incorporator.  Unless otherwise indicated, citations are to ECF pagination.

4

In September 2020, the company established a website at www.virex.health, Ansari Decl. ¶ 14, and on December 7, 2020, the company opened an account in the name "Virogex Inc." at JPMorgan Chase Bank, Alicia Decl. ¶ 14; Dkt. No. 19-10.  On or about September 22, 2020, Virogex signed a "Mutual Non-Disclosure Agreement" with Reliance Vitamin LLC to explore "a potential business opportunity of mutual interest."  Alicia Decl. ¶ 8; Dkt. No. 19-5.[3]

Virogex's business is the marketing and sale of pharmaceutical grade products for pets and supplements for human consumption.  Among the products it sells are: VIR-X, an "immune support" "dietary supplement," Dkt. No. 16-17; PETMECTIN, a pharmaceutical grade ivermectin for pets, Dkt. No. 26-21; PETDAZOLE, a pharmaceutical grade fenbendazole for pets, Dkt. No. 16-9; FISHCYCLINE, a pharmaceutical grade doxycycline for fish, Dkt. No. 16-13; and Flav-X, a pharmaceutical grade allulose, Dkt. No. 26-34.[4]  PETMETCIN, PETDAZOLE, and FISHCYCLINE are directed to pets, but Virogex also has advertised them for human consumption.  Tr. at 171:8–24; Plaintiff's Exhibit 17 at 14 (public post from Leonidov stating that if you "really want to protect yourselves" "the following may be your best option," and recommending taking Fenbendazole, Ivermectin, and Doxycycline); Dkt. No. 16-7 at 6.  VIR-X, launched in August 2021, was Virogex's first product.  Sidney Decl. ¶ 15; Dkt. No. 7-17.  Sales of the product were slow.  Virogex's revenues in 2021 were around $3,000 and its revenues in 2022 were around $10,000 to $15,000.  Tr. at 49:19–24.  Virogex launched PETMECTIN in

---

[3] The version of the document submitted is unsigned, as acknowledged by Alicia Belzberg in her declaration.  Alicia Decl. ¶ 8.  Defendants do not contest that the document is authentic or that such an NDA was signed by both Reliance Vitamin and Virogex.

[4] Ivermectin is an "antiparasitic" compound originally used to cure river blindness. Fenbandazole is a "dewormer for animals" that Sidney Belzberg testified has "interesting anticancer properties."  Tr. at 61:3–25.  Both are "can be" used for treating pets with parasites of infections, but, according to Plaintiff, have "been repurposed for other things as well."  *Id.* at 62:1–9.  Doxycycline is an "antibiotic," which can be "diluted in the water" in a fish aquarium to prevent bacterial infections.  *Id.* at 63:16–24.

April 2023 and PETDAZOLE on June 6, 2023.  Sidney Decl. ¶¶ 19, 22.  It launched FISHCYCLINE on October 4, 2023, and Flav-X on December 19, 2024.  Sidney Decl. ¶¶ 25, 28.  With the launch of PETMECTIN, PETDAZOLE, and FISHSCYCLINE and, in particular, with the introduction of PETMECTIN, Virogex's sales grew astronomically to millions of dollars a year.  Tr. at 50:2–8.

Responsibility for Virogex was divided between Leonidov and the Belzbergs.  As noted, Leonidov served as the sole officer and director of the company.  He assumed primary responsibility for the sales and marketing of Virogex's products.  Leonidov drew up the design of the packaging for the company's first product, VIR-X, which he then circulated to Sidney Belzberg and individuals at Reliance Vitamins for their input.  First Leonidov Decl. ¶ 22; Dkt. Nos. 16-15, 16-16.  He did the rough packing mockup for PETMECTIN which he sent to Sidney Belzberg for his review.  First Leonidov Decl. ¶¶ 8–9; Dkt. Nos. 26-19, 26-20.  He also suggested the label for PETDAZOLE and sent that to Sidney Belzberg for approval.  Dkt. No. 16-8; *see also* Dkt. No. 26-25 (Adobe illustrator logs showing that Leonidov designed the label for PETDAZOLE).  He also proposed the box design for FISHCYCLINE, First Leonidov Decl. ¶¶ 17-18; Dkt. Nos. 16-12, 26-28, and for FLAV-X, First Leonidov Decl. ¶ 29; Dkt. No. 26-33.

Beginning on April 23, 2023, Virogex marketed and sold its products primarily through Leonidov's personal Substack, titled "2nd Smartest Guy in the World" (or "2SG"), which linked to Virogex's website through which the products could be ordered.  Second Leonidov Decl. ¶ 3; Dkt. No. 26-5.  Leonidov's 2SG posts and associated newsletter drove Virogex's sales, Second Leonidov Decl. ¶ 66, while another popular Substack author, the "Health Ranger," also promoted the products.  Tr. at 42:14–19 (Alicia Belzberg testifying that "Health Ranger brought in about 1/3 of our entire revenues."); *see* Plaintiff's Exhibit 4 at 4 (print out of Health Ranger website

advertising PETMECTIN with unique discount code).  Ansari testified that "[i]n my experience, the customer base was overwhelmingly composed of members of the 2SG audience."  Ansari Decl. ¶ 34.  Paul Yates similarly testified that "[b]ased on my observations, the business was completely dependent on Vas's 2SG Substack Newsletter content and communications with his audience, which were the sole source used to generate sales."  Yates Decl. ¶ 17.

The Belzbergs made the initial decision in 2020 to involve Leonidov in the business, Sidney Belzberg Decl. ¶ 8, contributed the initial capital to the company, came up with the concept of marketing products like Ivermectin and Fenbendazole indicated for animals and repurposing the product for other diseases, published articles on the research, sourced the products, found the supplier in India, and ordered and purchased them and handled the back office and legal filings.  Tr. at 45:23–46:4, 44:15–18; Yates Decl. ¶ 16 (noting that the Belzbergs ordered the inventory); Dkt. No. 16-7.  They also consulted on and helped design the packaging for the products.  Tr. at 83:4–12.  While Leonidov paid for the website out of his credit card (for which he ultimately was repaid by Virogex), Alicia Belzberg made the actual purchase.  Tr. at 27:25–28:12; Alicia Decl. ¶ 11; Dkt. No. 19-8.[5]

Orders for Virogex's products were made through Virogex's website, Sidney Decl. ¶¶ 13, 32; . Dkt. Nos. 7-17–7-20, revenues for the sales of those products flowed into Virogex's bank account, and expenses for the company were paid for out of Virogex's bank account, Alicia Decl. ¶ 12; *see* Dkt. Nos. 19-11, 19-12, 19-13 (Virogex bank account statements detailing company revenues and payments); Tr. at 97:8–15.  When a product was ordered it was invoiced by Virogex, Tr. at 185:13–24, and upon sale of the products, proceeds were deposited

---

[5] Leonidov testified that he purchased the website, First Leonidov Decl. ¶ 3, but he did not dispute the testimony at the hearing that he did so only in the sense that he loaned his credit card to Alicia Belzberg.

automatically into Virogex's corporate bank account via the third-party payment processor Stripe.  Sidney Decl. ¶ 31; *see* Dkt. No. 19-13 (bank record).  In communications from Reliance regarding the VIR-X product, the "Client" was listed as "ViroGex."  Dkt. No. 16-17.  Invoices from Reliance went directly to Virogex, Inc, and those invoices were paid from the Virogex bank account.  Alicia Decl. ¶¶ 9–10; Dkt. Nos. 19-6, 19-7 (invoice and bank record).

Both the Belzbergs and Leonidov were paid out of the Virogex bank account.  Leonidov was paid a profit as a corporate officer of Virogex from that bank account.  Tr. at 96:21–97:4 (Sidney Belzberg testifying that Leonidov received over a million dollars from Virogex derived "from the sale of the products that Virogex owned."); *id.* at 160:15–22 (Leonidov testifying that he received "more than 100,000" dollars).  When Leonidov's expenses were to be reimbursed, they were reimbursed from the Virogex bank account.  Alicia Decl. ¶ 11; Dkt. No. 19-8; Tr. at 165:18–25 (Leonidov acknowledging that he reimbursed himself "for various business expenses" as an "officer of Virogex.").

## III.    The Company's Share Ownership

The parties hotly dispute the share ownership of Virogex.  Plaintiff states that Sidney and Alicia Belzberg, along with Margareta Linden, an early scientific consultant for the company, are the sole shareholders of Virogex.  They assert that Virogex issued 10,500,000 shares in early 2021 and that Alicia Belzberg holds 8,000,000 shares, Sidney Belzberg holds 2,000,000 shares, and Margareta Linden holds 500,000 shares.  Alicia Decl. ¶ 4; Sidney Decl. ¶ 4.  In his declarations in this case, Leonidov swears that he is the "rightful owner" of Virogex.  First Leonidov Decl. ¶ 6.  In his first declaration in this case, Leonidov swears that he is the "50% shareholder" of Virogex.  *Id.* ¶ 5. In his second declaration in this case, Leonidov swears that Virogex issued 9,000,000 shares, that he holds 4,000,000 shares, and that Ansari holds 500,000 shares while the Belzbergs hold 2,000,000 shares each and Linden holds 500,000 shares.  Second

8

Leonidov Decl. ¶ 25.[6]  He has claimed that he was a 50% shareholder of Virex and also has claimed that he holds 45% of the shares and Ansari holds the remaining 5% of the shares.  Tr. at 125:4–17.

The parties elicited extensive testimony at the hearing on the share ownership of Virogex. The testimony of both parties on the issue of ownership turns in part on several share certificates attached by Alicia Belzberg to her declaration.  Each is dated January 23, 2021, and bears the signature of Leonidov: certificate 1 is issued to Alicia Belzberg, in the amount of 4,000,000 shares.  Certificate 2 is issued to Sidney H. Belzberg in the amount of 2,000,000 shares. Certificate 3 is issued to Alicia Belzberg in the amount of 2,000,000 shares.  Certificate 5 is issued to Alicia Belzberg in the amount of 2,000,000 shares.  Certificate 5 is issued to Margareta Linden in the amount of 500,000 shares.  There is no Certificate 4.  The total issued shares is 10,500,000.

Alicia Belzberg testified that the company issued five share certificates in 2021.  Alicia Belzberg testified that she filled out the certificates while she, Sidney, and Leonidov were together in a room, and that Leonidov signed them.  Tr. at 47:20–48:4.  She denied that Leonidov and Ansari were issued shares.  *Id*. at 48:20–22.  Alicia Belzberg also explained that although the share certificate are numbered, there is no fourth certificate because she made a mistake in filling it out, and so decided to throw it out and proceed directly to the fifth.  *Id*. at 48:6–12.  Alicia also explained that she was issued more than one certificate non-sequentially because she was considering putting some of her shares in a holding company or selling some of her shares, and to do so it would be easier to have multiple certificates for slightly small numbers of shares

---

[6] Leonidov also states inconsistently that Ansar holds a 10% interest in the company. *Id.*

rather than one certificate that would have to be cancelled and then new shares issued. *Id*. at 37:4–14.

Sidney Belzberg testified that he offered Leonidov an opportunity to invest in the company for a small capital contribution and that he declined. *Id*. at 71:23–72:1; Sidney Decl. ¶ 8. He also testified that Linden was given an equity position in the company because she would consult on the scientific attributes of the compounds. Tr. at 68:12–69:8. He testified that Leonidov signed the share certificates and that he and his wife held approximately 95% of the shares in Virogex and Linden held the remainder. *Id.* at 78:12–18, 79:16–21.

Leonidov testified at the hearing that Virogex issued only 9 million shares. He further asserted that the documents presented to the Court were forged, that the first share certificate was intended to be his, and that he was never in possession of the share certification and they were "never given to [him]." *Id*. at 153:20–22. He testified that the first share certificate, which awards four million share to Alicia Belzberg, should have awarded him four million shares. *Id.* at 153:9–14. And he continued that although he physically handled the share certificates on the day that he signed them, he left the share book behind. *Id.* at 153:23–154:21.

Ansari submitted a declaration stating that "[i]n or around September 2020, [he] was granted a 5% ownership interest in Virogex Inc. in exchange for [his] technical contributions" and that he understood that the interest "corresponded to 500,000 shares and Certificate No. 4." Ansari Decl. ¶¶ 4–5.

The testimony of Sidney and Alicia Belzberg is credible. It is confirmed by the share certificates attached to Alicia Belzberg's declaration. Dkt. No. 19-2. It also is corroborated by the State of Delaware Annual Franchise Tax Reports filed with the State by Virogex Inc. for each of the years from 2020 through 2025. Dkt. No. 19-3. Each of the reports was signed by

10

Leonidov under penalty of perjury.  The first report signed by Leonidov is dated January 6, 2021 and the last report signed by him is dated February 2025.  In each Leonidov represented that Virogex had 20,000,000 authorized shares but that it had issued 10,500,000 shares—the number of shares reflected in the certificates produced by Plaintiff and that the Belzbergs testified had been issued.  The reports do not mention 9,000,000 shares.

Leonidov's testimony that Virogex had 9,000,000 shares and that he holds half of the shares of Virogex, either directly or in concert with Ansari, is not credible.  Leonidov did not dispute at the hearing that he signed share certificates for Virogex, that the Belzbergs were issued shares, and that Linden was given 500,000 shares of Virogex.  He also testified that he never had physical possession of the shares because they were never given to him and he left them with the Belzbergs on the day that they were signed.  He offered the following testimony:

> Q.      My question was, have you presented any documents aside from your averments that showed you own shares of Virogex?
>
> A.       I was unable to present any documents since I was not in any possession of documents.  They were never given to me.  They were taken. And –
>
> THE COURT: So when you say that you had a share that was physically taken from you, when were you in physical possession of a share that had your name on it, that you no longer had?
>
> THE WITNESS: So the day that I signed everything, that was the day that I was – I wouldn't say in possession, but that's when they were physically in my presence and I left that book.
>
> THE COURT: Was there a share certificate physically in your hands?
>
> THE WITNESS: Well, I mean, I was writing my signatures on those shares, yes, on the five shares.
>
> THE COURT: And then you wrote your signature on something that had your name.
>
> THE WITNESS: Correct.

THE COURT: And then you say you handed it back to the Belzbergs?

THE WITNESS: He – it wasn't even handed.  It was in a book, and I just left the book.  …

Tr. at 153:18–154:16.

Leonidov's testimony was directly contrary to the statement Leonidov swore to under oath in September 2025 in New York State Supreme Court.  PX6.  In that declaration, Leonidov swore that he had possession of the shares until they were taken from him.  In particular, he stated that 50% of the shares of Virogex in aggregate were issued to him and the shares were issued in 2020 shortly after the company's formation and resided in Leonidov's home office until they were removed from that office without his knowledge or authorization.  PX 6 ¶ 5.  He did not testify to a date on which the shares were taken.  The Court concludes that the shares were never in Leonidov's possession because no shares were issued to him.

Moreover, Leonidov's testimony regarding the Delaware Franchise Tax Reports tends to support the Belzbergs' testimony and, to the extent it does not, is not credible.  Leonidov did not deny that he had signed the Tax Reports and that he did so under penalty of perjury.  However, he blamed Alicia Belzberg for the fact that the Tax Reports stated that Virogex had issued 10,500,000 shares.  He testified that Alicia and Sidney Belzberg handled the "back-end corporate work" and that he trusted Alicia Belzberg to supply him with the correct documents and paperwork so that he would be compliant.  Tr. at 131:17–132:1.  To the extent that Leonidov ascribed the figure of 10,500,000 shares to information he received from Alicia Belzberg, such testimony is further corroborative of the fact that Virogex had 10,500,000 shares and that Leonidov held none of those shares.  The earliest tax form signed by Leonidov is from January 2021, shortly after the company was formed and at the time that Alicia Belzberg testified that the shares were issued.  Leonidov has identified no reason Alicia Belzberg would have stated at that

time, and every year thereafter, that Virogex had 10,500,000 shares if that information was not truthful. There is no evidence of animosity or a motive to fabricate on the part of Alicia Belzberg in January 2021—the Belzbergs had just then agreed that Leonidov could serve as the sole officer and director of the company. As indicated below, the tensions between the Belzbergs and Leonidov developed only after the company began to make significant money and only in 2021. Alicia Belzberg's prior consistent statement undermines any inference that her testimony in 2026 regarding the shares issued in 2021 is untruthful. At the same time, there also would have been no reason for Leonidov to sign the Delaware Tax Reports reflecting the 10,500,000 shares if he did not also understand that 10,500,000 had been issued by Virogex. The reports are two pages long and are sworn to under penalty of perjury. The only information reported in them are the number of authorized and issued shares and the officers and directors of Virogex. It is incredible that Leonidov never read the reports but simply signed them. The more plausible inference, and the one the Court draws, is that Leonidov's testimony that there were 9,000,000 shares is a contrivance designed for the current dispute with the Belzbergs and does not reflect the reality from 2020 and 2021.

Leonidov's account, moreover, does not make sense even standing alone. According to Leonidov, the share certificates presented by the Belzbergs are forged. He states that there were only ever 9,000,000 shares, that he was issued 4,000,000 shares and that Ansari was issued 500,000 shares, while the Belzbergs were issued 2,000,000 shares each and Linden was given 500,000 shares. He casts doubt on the reliability of the shares proffered by the Belzbergs by noting that there is a gap in the share certificates between certificate three and certificate five, and that Alicia Belzberg was given three certificates. (As noted, Alicia Belzberg testified credibly regarding the gap and the three certificates.) But if, as Leonidov asserts, the Belzbergs

13

forged the certificates, one would have expected them to have done a better job—they could have simply forged one certificate in the name of Alicia Belzberg and eliminated the gap.  The most reasonable inference, and the one the Court draws, is that the certificates are not forged and that it is Leonidov who has made up a story regarding the share certificates, stating falsely that he had 4,000,000 shares simply because the first certificate to the Belzbergs reflects 4,000,000 shares and that Ansari had 500,000 shares because there is a certificate in which it is reflected that Linden has 500,00 shares.

Leonidov relies on a March 24, 2025 email in which Sidney Belzberg writes to Leonidov that "we are equal partners," Dkt. No. 16-7 at 4; First Leonidov Decl. ¶ 6, and a March 26, 2025 email in which Sidney Belzberg describes himself as "a 50 percent share holder," Dkt. No. 16-7 at 7.  Leonidov reasons that if he and Sidney Belzberg are equal partners, it must mean that they equally share in the equity of Virogex and that if Sidney Belzberg was a "50 percent share holder," it must mean that he holds the remaining 50 percent (either directly or in combination with Ansari).  The emails do not bear the weight Leonidov places on them.  They were written at a time when Leonidov was threatening to Sidney Belzberg that he would dissolve Virogex.  Sidney Belzberg testified that, at the time, he had suffered several strokes and was "incapacitated" to the point he would frequently have seizures and black out.  Tr. at 69:15–18.[7]  The statement regarding equal partnership can be readily understood to refer to the profit-sharing arrangement described by both Sidney Belzberg and Leonidov.  The Belzbergs and Leonidov would both contribute to the company, the Belzbergs through sourcing the product and contributing the capital and Leonidov by serving as CEO, and they would share 50-50 in the profits of the company.  If the Belzbergs took money out of the company, Leonidov would be

---

[7] Alicia Belzberg testified to the same effect.  Tr. at 39:7–14; Alicia Decl. ¶ 22.

able to take the same amount of money out of the company.  In that sense, they were, as Yates

put it "50/50 partner[s]."  Yates Decl. ¶ 6.  But that does not mean that they were equal owners

of the corporation.  Yates put the point well when he explained the relationship between Sidney

Belzberg and Leonidov.  He was asked whether the two described themselves as being equal

shareholders or equal partners.  He testified that they talked about their friendship, and that they

talked about how they were "50/50 partners in this endeavor, and they were proud of the

endeavor together."  Tr. at 184:18–21.[8]

That testimony is corroborative of the testimony of Alicia and Sydney Belzberg that

Leonidov had a profit-sharing relationship with the company and not that he was a shareholder.

Alicia Decl. ¶ 5; Sydney Decl. ¶ 8 ("His preference was a simple profit sharing arrangement,

pursuant to which he received funds."); Tr. at 70:9–11 (Sidney Belzberg testifying that when he

used the word "partner" he meant "profit-sharing."). It is uncontested that Leonidov did enjoy

the profits of Virogex.  Tr. at 95:15–23 (Sydney Belzberg testifying that the parties had an

informal agreement where they would withdraw money from the corporate bank account as

needed; "[i]t wasn't a formal agreement.").

Finally, the Court puts no weight on Ansari's statement that he understood he had a 5%

interest in the company.  That understanding is not reflected in any document much less in a

contemporaneous document or one that the Belzbergs would have seen.  Ansari testified that the

understanding came from Leonidov.  Tr. at 191:11–14.  It thus does not add to the testimony of

Leonidov himself that the Court has found not to be credible.

---

[8] Ansari testified that he "understood the ownership structure to be a 50/50 arrangement."  Ansari
Decl. ¶ 6.  But it is clear from Ansari's testimony that he gathered that understanding only from
Leonidov.  Tr. at 193:2–12.

In consideration of the evidence presented, the Court finds that there were 10,500,000 shares issued in the form of the share certificates at Dkt. No. 19-2, and that 8,000,000 of these were issued to Alicia Belzberg, 2,000,000 to Sydney Belzberg, and 500,000 to Margareta Linden.

## IV.    Breakdown in Relationship

On February 28, 2025, Sidney Belzberg withdrew $34,000 from the Virogex bank account to pay for an apartment rental.  PX6 at 8.  The payments brought to a head a dispute between Leonidov and the Belzbergs.

At 7:31 p.m. on March 23, 2025, Leonidov sent a text to Sidney Belzberg challenging his payment of $34,000 for personal expenses as "looting" and inconsistent with the agreement between the partners to decide between themselves "what the payouts will be going forward and how the profits will be allocated." PX12.  Leonidov stated that if Belzberg did not agree to his terms, "then you and me must have a meeting on how to wind this company down and I will restart a new one." PX12.  Several hours later, Leonidov sent a follow-up email to Sidney Belzberg asserting that he had the right to plan "exactly how the company monies are paid out, distributed, invested, managed, and so on and so forth," and that because Belzberg did not agree and did not respect Leonidov as Chief Executive Office, he had "forfeited [his] rights and claims in the matter of VIROGEX, INC." and that Leonidov would send "my plan of how this amicable separation will transpire, and what you will receive as your exit package." Dkt. No. 16-7 at 4. Sidney Belzberg responded the following day that the two were "equal partners," and he was "happy to discuss how you want to go forward," and explained that he had "not suggested I want the company wound down." *Id*.  Leonidov apparently responded with a plan regarding the monies that each would take out of the company, PX12 at 2, and Sidney Belzberg apparently agreed, *id.* at 1.  *See also* First Leonidov Decl. ¶ 42 (explaining that Leonidov confronted Sidney

16

and Alicia Belzberg about financial misconduct and self-dealing in spring of 2025); Plaintiff's Exhibit 2 (text message from Leonidov expressing the same).  On March 26, 2025, Sidney Belzberg sent a long email to Leonidov, disputing Leonidov's claims that Belzberg was looting the company and that Leonidov was solely responsible for the company's success.  Dkt. No. 16-7 at 1.  Belzberg concluded that the parties should "focus on the crucial business of helping others."  *Id.*

The parties could not come to an agreement on how to run the business.  On or about April 29, 2025, Leonidov closed down the Virogex bank account.  PX6 ¶ 4; Second Leonidov Decl. ¶ 12.  Leonidov also removed the Belzbergs from Virogex and dissolved the entity with the Delaware Division of Corporations.  Second Leonidov Decl. ¶ 12; First Leonidov Decl. ¶ 42.; Alicia Decl. ¶ 23.  In response, Alicia and Sydney Belzberg, along with Margareta Linden, removed Leonidov as a director and officer of the company.  On April 23, by a Unanimous Written Consent of the Company's shareholders, under Article 4.4 of the Company's Bylaws, Alicia Belzberg, Sidney Belzberg, and Margareta Linden voted to remove Leonidov as the sole director of the company.  Alicia Decl. ¶ 19; Dkt. No. 7-23 at 5–6; *see also* Dkt. No. 16-3 (Company bylaws permitting removal by shareholder vote).  Upon Leonidov's removal, Sidney and Alicia Belzberg were elected as Directors of the Company, "making up the entirety of the Board of Directors."  Dkt No. 7-23 at 5.  The same day, and by another Unanimous Written Consent of Virogex's Board of Directors (that is, Sidney and Alicia Belzberg), Virogex terminated all of Leonidov's roles.  Sidney Decl. ¶ 44; Alicia Decl. ¶ 19; Dkt. No. 16-23 at 2–3. In that same Unanimous Written Consent, the Board resolved that Sidney Belzberg is elected President of the Company and that Alicia Belzberg is elected Secretary and Treasurer.  *Id.* at 2. The Unanimous Written consent directed counsel for Virogex to remove Leonidov as the

17

signatory on Virogex's bank accounts, cancel any credit or debit cards issued to Leonidov, and restore Sidney and Alicia Belzberg as authorized signatories for all Virogex accounts.  *Id.* at 3.

Following these actions, Leonidov created ResolvX Health Inc. as a New Hampshire corporation.  Sydney Decl. ¶ 45; First Leonidov Decl. ¶ 45.  Leonidov "introduced" ResolvX Health on his 2SG Substack page, on which he stated that: "All of the amazing products that this Substack has been promoting for many years that you have been sourcing from VIREX HEALTH will now be offered exclusively [] RESOLVX HEALTH."  Dkt. No. 7-26 at 2.  That post continued to explain that it would offer "all of the currently available products like VIR-X, PETMECTIN, PETDAZOLE, FISHCYCLINE, CBD-X and FLAV-X," and that "any other company offering RESOLVX HEALTH products is selling you counterfeit items."  *Id.* at 2–3; *see* Sydney Decl. ¶ 49.  The ResolvX website sells identical products to those offered by Virogex with identical packaging; the only difference is that the ResolvX products have the ResolvX brand on the packaging instead of the Virex Health brand.  Sydney Decl. ¶ 46.  *Compare* Dkt. No. 1-1, Dkt. No. 102:





Following the split, because Leonidov had shut down Virogex's bank account, Alicia Belzberg was required to open a new bank account for the company. Alicia Decl. ¶ 23. Upon learning about Leonidov's dissolution of Virogex in Delaware, Alicia Belzberg revoked the dissolution in September 2025. Alicia Decl. ¶¶ 23, 26. Around this same period, both Virogex and Leonidov claim to have had issues operating the virex.health website. Sydney and Alicia Belzberg migrated the virex.health website from its previous host at Linode to Amazon Web Services. First Leonidov Decl. ¶ 42; Tr. at 24:1–19 (Alicia Belzberg testifying that "the servers that hosted the website were unlawfully taken away," and they had to "reconstitute the entire website using different servers," and that "this time we used AWS."). Namecheap (the domain name registration for the virex.health domain) notified Virogex that a third party was attempting to change the log-in credential for the virex.health domain account. Alicia Decl. ¶ 24. Ultimately, because the email on file with Namecheap was virexsup@gmail.com, an email maintained by Alicia Belzberg on behalf of Virogex, Virogex maintained access to the domain name. *Id.*[9] Virogex returned the virex.health website to operation in June of 2025. Alicia Decl. ¶ 25; Sidney Decl. ¶ 42; First Leonidov Decl. 47.

---

[9] Leonidov has submitted a report from "ISECOM Labs" concluding that Leonidov is the rightful owner of the domain virex.health, and that on or around April 30, 2025, the domain "experienced

In October of 2025, Sidney Belzberg initiated an action in the Supreme Court of the State of New York, New York County against Leonidov and ResolvX health, among others. *See Belzberg v. Leonidov et al.*, Index. No. 656024/2025 (Supreme Court of the State of New York, filed on October 7, 2025). In the Amended Complaint in that action filed December 24, 2025, Belzberg sued for breach of fiduciary duty, breach of contract, breach of the duty of loyalty, faithless servant, unfair competition, unjust enrichment, conversion, tortious interference with prospective economic relations, declaratory judgment, defamation, self-dealing, legal malpractice, deceptive business practices, violations of the New York Human Rights Law, and accounting violations against the defendants there. *Id.* at Dkt. No. 137. Belzberg requested injunctive relief, which the state court denied on the basis that the injunction sought would restrain the Defendants' online speech and that such an injunction would grant the ultimate relief sought. Dkt. No. 7-12. That lawsuit remains pending.

Since the breakdown in relations, both companies have continued to sell products branded as PETMECTIN, PETDAZOLE, FISHCYCLINE, FLAV-X, and VIR-X on their respective websites. Tr. at 93:3–13 (Sidney Belzberg stating that ResolvX is "presently selling these products" that are "identical" other than the ResolvX brand name).[10] Both Virogex and

---

a coordinated unauthorized takeover." Dkt. No. 16-21 at 2. In reaching the conclusion that Leonidov was the rightful owner of the domain name, the report relied entirely on evidence provided by Leonidov, including payment receipts for the domain registration. *Id.* at 4. As previously explained, although Leonidov made the initial payment, it was reimbursed by Virogex, and the website was used to sell the company's products. *See* Alicia Decl. ¶ 11; Dkt. No. 19-8. It is not contested that Virogex paid for the maintenance of the domain following Leonidov's initial payment. *See* Alicia Decl. ¶ 12; Dkt. No. 19-11 (bank record showing Namecheap payments). The report is hearsay. The Court also does not find the conclusions of the report to be credible and will not consider it further.

[10] At the evidentiary hearing, Sydney Belzberg testified that at the moment, certain products are sold out on the Virogex website. Tr. at 112:22–113:8. That the products are sold out at this moment in time does not indicate they are not or have not been available on the website for sale at other times.

ResolvX use the same Indian manufacturer to produce their products.  Tr. at 58:9–20 (Alicia Belzberg testifying that Virogex has used "the same supplier since the beginning," which is TULI Enterprise in India); Tr. at 172:19–173:14 (Leonidov testifying that he is using the same supplier to get the "identical" product).  Customers have expressed confusion with respect to the goods sold by Virogex and ResolvX.  Sydney Decl. ¶ 52; First Leonidov Decl. ¶ 62.  Plaintiff has submitted several customer emails expressing such confusion, including emails asking whether "the company ResolvX health . . . is legitimately sending me your promotional ads?" and asking whether Virex Health and ResolvX are "one in the same?"  Dkt. No. 7-27 at 3, 10; *see also* Dkt. No. 16-23 (emails to ResolvX indicating confusion with products from Virex Health).  Virogex has stated that because of this confusion, its sales have suffered considerably. Sidney Decl. ¶ 59.

## V.    The Trademark Registrations

Beginning on May of 2025, Plaintiff began submitting applications with the United States Patent and Trademark Office ("USPTO") to register word and design marks associated with the company's name, website, and products.  In May and July of 2025, Virogex applied with the USPTO to register word and design marks for PETMECTIN, PETDAZOLE, FISHCYCLINE, FLAV-X, and VIR-X.  Sydney Decl. ¶ 50.  The USPTO published the PETMECTIN, PETDAZOLE, and FISHCYCLINE word marks for opposition on November 4, 2025, which Leonidov opposed on December 3, 2025.  Dkt. Nos. 7-4, 7-6, 7-8.  The USPTO published the PETMECTIN, PETDZOLE, and FISHCYCLINE design marks for opposition on January 27, 2026, which Leonidov opposed on February 26, 2026.  Dkt. Nos. 7-5, 7-7, 7-9.  The USPTO published the FLAV-X design mark for opposition on February 3, 2026, which Leonidov opposed on March 5, 2026.  Dkt. No. 7-10.  The applications remain pending.

**PROCEDURAL HISTORY**

Plaintiff initiated this case by Complaint filed on April 17, 2026.  Dkt. No. 1.  That same day, Plaintiff submitted a request for a temporary restraining order and further injunctive relief.  Dkt. No. 7.  Defendants responded on April 21, 2026.  Dkt. No. 16.  The Court held a conference on the motion for temporary injunctive relief on April 22, 2026.  Minute Entry of April 22, 2026.  At the conference, the Court denied the application for a TRO.  Plaintiff then submitted a supplemental motion for a preliminary injunction, along with seventeen exhibits, on April 27, 2026.  Dkt. No. 27.  Defendants submitted a response, along with thirty-five exhibits, on May 1, 2026.  Dkt. No. 26.  Plaintiff submitted a reply on May 5, 2026.  Dkt. No. 34.  The Court held a conference on the motion for a preliminary injunction on May 6, 2026.

**LEGAL STANDARD**

"A party seeking a preliminary injunction must demonstrate: (1) 'a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor'; (2) a likelihood of 'irreparable injury in the absence of an injunction'; (3) that 'the balance of hardships tips in the plaintiff's favor'; and (4) that the 'public interest would not be disserved' by the issuance of an injunction." *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (quoting *Salinger v. Colting*, 607 F.3d 68, 79–80 (2d Cir. 2010)).  "A preliminary injunction is an extraordinary remedy never awarded as of right.  In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (quoting *Amoco Prod. Co. v. Village of Gambell, AK*, 480 U.S. 531, 542 (1987)).

"To establish a likelihood of success on the merits, a plaintiff 'need not show that success is an absolute certainty.  [It] need only make a showing that the probability of his prevailing is

22

better than fifty percent.'" *Broker Genius, Inc. v. Volpone*, 313 F. Supp. 3d 484, 497 (S.D.N.Y. 2018) (citation omitted). Moreover, Virogex needs only to show a likelihood of success on one of its federal causes of action. *See, e.g., Forest City Daly Hous., Inc. v. Town of N. Hempstead*, 175 F.3d 144, 151 (2d Cir. 1999) ("At the preliminary injunction stage, plaintiffs need to show a likelihood of success with respect to only one of these statutes.").[11]

## DISCUSSION

### I.      Capacity to Sue

Defendants argue initially that Virogex has not established that it has the capacity to sue and therefore cannot maintain the present action. They argue that the board of directors of Virogex was not properly constituted because the Belzbergs had no authority to remove Leonidov as director and that, consequently, the unanimous written consent of Sidney and Alicia Belzberg authorizing this lawsuit was ineffective.

The capacity to sue and be sued is determined "for a corporation, by the law under which it was organized." Fed. R. Civ. P. 17(b)(2); *see* Wright and Miller § 1292 (4th ed.). Defendants

---

[11] Defendants incorrectly argue that Plaintiff seeks a mandatory injunction rather than a status quo injunction because the requested relief would prevent it from selling its products under the challenged marks. Dkt. No. 26 at 2–3. A mandatory injunction may issue only upon a showing of a clear or substantial likelihood of success on the merits." *Int'l Bus. Machines Corp. v. De Freitas Lima*, 2020 WL 5261336, at *6 (S.D.N.Y. Sept. 3, 2020), *aff'd sub nom. Int'l Bus. Machines Corp. v. Lima*, 833 F. App'x 911 (2d Cir. 2021) (summary order). However, the status quo does not refer to the status at the time the lawsuit is brought but rather, "the last actual, peaceable uncontested status which preceded the pending controversy," which in this case would be when Virogex alone had the use of the challenged Marks. *N. Am. Soccer League, LLC v. U.S. Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018) (quoting *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014)); *see also Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 114 (2d Cir. 2006) (stating that "in the typical trademark case a prohibitory injunction seeks to stop alleged infringement" while "mandatory injunction . . . orders an affirmative act or mandates a specified course of conduct such as requiring a defendant to turn over phone numbers featuring a tradename or to assign a trademark") (internal citations and quotations omitted). Plaintiff does not seek to compel Defendants to take an affirmative act  Thus, the Court applies the standard for a status quo injunction.

frame this question as one of standing, but the Second Circuit has held that the legal concept of capacity to sue "is non-jurisdictional in nature." *Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 382 (2d Cir. 2021). That is, "[c]apacity to sue addresses only whether a person or company that possesses an enforceable right may act as a litigant," and that "although it is 'allied with . . . the question of standing,' capacity is 'conceptually distinct.'" *Id.* (quoting 59 Am. Jur. 2d Parties § 26); *see LBBW Luxemburg S.A. v. Wells Fargo Sec., LLC*, 744 F. App'x 710, 714 n.3 (2d Cir. 2018) (summary order) ("Capacity to sue is a threshold matter allied with, but conceptually distinct from, the question of standing."); 6A Wright & Miller Fed. Prac. & Proc. Civ. § 1559 (3d ed.) ("Capacity has been defined as a party's personal right to come into court, and should not be confused with the question of whether a party has an enforceable right or interest.").

Although capacity to sue is not a jurisdictional issue, "'a party must maintain its capacity to sue throughout litigation,' and lack of capacity is grounds for dismissal." *Sonterra Cap. Master Fund, Ltd. v. Barclays Bank PLC*, 403 F. Supp. 3d 257, 267 (S.D.N.Y. 2019) (quoting *New Asia Enters. Ltd. v. Fabrique, Ltd.*, 2017 WL 384687, at *1 (S.D.N.Y. Jan. 26, 2017)); *see* 6A Wright & Miller Fed. Prac. & Proc. Civ. § 1559 (citing *Mather Constr. Co. v. United States*, 201 Ct. Cl. 219 (1973), in which the plaintiff lost the capacity to sue while prosecuting a lawsuit by "failing to pay its taxes," resulting in the action being dismissed). Although, under Federal Rule of Civil Procedure 9(a) a plaintiff "need not allege" its "capacity to sue or be sued," the issue is raised where a party does so "by a specific denial, which must state any supporting facts that are particularly within the party's knowledge." Fed. R. Civ. P. 9(a).

24

Virogex is a Delaware corporation and was incorporated on September 22, 2020, under Delaware law.  Dkt. No. 19-1.[12]  Defendants do not dispute that under the law of Virogex's state of incorporation, Virogex has the capacity to sue and be sued.  Under Delaware law, "[e]very corporation . . . shall have the power, whether or not so provided in the certificate of incorporation, to . . . sue and be sued in all courts and participate, as a party or otherwise, in any judicial . . . proceeding, in its corporate name."  8 Del. C. § 122(2).

Defendants raise a different type of challenge.  They argue not that Virogex in general lacks capacity, but that this lawsuit was not authorized.  The decision whether to initiate litigation is vested in the corporation's board of directors.  The authority of a company's board to "govern corporate affairs extends to decisions about what remedial actions should take after being harmed, including whether the corporation should file a lawsuit against its directors, its officers, its controller, or an outsider."  *United Food & Com. Workers Union v. Zuckerberg*, 262 A.3d 1034, 1047 (Del. 2021).  Therefore, "[t][he decision of whether to initiate or pursue a lawsuit on behalf of a corporation is generally within the power and responsibility of the board of directors."  *In re Zimmer Biomet Holdings, Inc. Deriv. Litig.*, 2021 WL 3779155, at *10 (Del. Ch. Aug. 25, 2021) (quoting *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 120 (Del. Ch. 2009)).  Defendants argue that, because the unanimous written consent was not signed by him, it is not valid and therefore this suit is not valid.  *See Applied Energetics, Inc. v. Farley*, 239 A.3d 409, 429 (Del. Ch. 2020) (if an action is "not validly approved" by the board of a corporation, "the actions taken . . . [are] therefore invalid").  In essence, Defendants ask the

---

[12] As explained in the findings of fact, the corporation was briefly dissolved in July of 2025 by Leonidov, but that dissolution was revoked by the State of Delaware on September 5, 2025. Alicia Decl. ¶ 26.

25

Court to rule that Leonidov remains the sole director of Virogex and that Sidney and Alicia Belzberg have no authority to act as directors for the company.  The argument is without merit.

Ordinarily, actions to determine who the validly designated officers and directors of a Delaware corporation are brought under Section 225 of the Delaware General Corporation Law. *See Testa v. Jarvis*, 1994 WL 30517 (Del. Ch. Jan. 12, 1994).[13]  Delaware law establishes a hierarchy of proof to establish the shareholders eligible to vote in an election.  "Delaware corporations may rely almost exclusively on the stock ledger to determine the record holders eligible to vote in an election." *Id.* at *6.  "Where the company's ledgers show record ownership, no other evidence of shareholder status is necessary." *Id.*  Next, "when the stock ledger is blank or non-existent, the Court of Chancery has the power to consider other evidence to ascertain and establish stockholder status." *Rainbow Navigation, Inc. v. Pan Ocean Navigation, Inc.*, 535 A.2d 1357, 1359 (Del. Ch. 1987).  Possession of a stock certification, though not necessary, is "strong evidence that a person is a shareholder." *Testa*, 1994 WL 30517 at *6; *see also Boris v. Schaheen*, 2013 WL 6331287, at *13 (Del. Ch. Dec. 2, 2013); *Viele v. Devaney*, 678 A.2d 993, 999 (Del. Ch. 1996) (a "stock certificate is strong evidence that [a party] own[s] those shares.").  Finally, in the absence of a stock ledger or share certificate, the person claiming to be a shareholder has the "onus" to "show that [he] is indeed a shareholder." *Testa*,

---

[13] The parties have not addressed whether a federal court has the authority to grant what is, in effect, Section 225 relief through the vehicle of a challenge to a party's capacity to sue (and indeed that this case properly presents the question of capacity to sue).  The Court thus assumes for purposes of the motion for a preliminary injunction, without deciding, that the question of whether Leonidov was properly removed and this lawsuit properly authorized raises a question of "capacity" and is properly before the Court.  Should Plaintiff's capacity continue to be challenged, the Court would benefit from further briefing on these issues. *See Celluci v. O'Leary*, 2020 WL 977986, at *7 (S.D.N.Y. Feb. 28, 2020) ("The Court has not found any instance of a federal court, anywhere in the country, granting relief pursuant to Section 225, and Plaintiffs have not explained why this Court, rather than the Chancery Court, should determine who are the rightful officers and directors of [the company].").

26

1994 WL 30517, at *6.  A person alleging that share certificates are forged "bear[s] the burden of proving that the documents are forgeries."  *Clymer v. DeGirolano*, 2021 WL 2181377, at *4 (Del. Ch. May 27, 2021).

Regardless where the burden properly lies, the evidence establishes that the Belzbergs and Linden are the shareholders of Virogex, that Leonidov was properly removed as director, and that this lawsuit was properly authorized.  *See Testa*, 1994 WL 30517, at *6 ("Even if one were to look beyond the stock ledger, the facts surrounding the purported issuance of shares to Ms. Testa in this case are so inconsistent that a reasonable conclusion cannot be made that she was indeed a shareholder.").  Pursuant to 8 Del. C. § 141(f), "[u]nless otherwise restricted by the certificate of incorporation or bylaws," an action can be taken by signed written consent. Virogex's bylaws permit the shareholders without meeting to take any action which may be taken at an annual or special shareholder meeting so long as "all of the shareholders entitled to vote on the subject consent to the action in writing."  Dkt. No. 16-3 ¶ 2.10.  Such action includes the removal of an office or director and the appointment of new officers and directors.  *Id.* ¶¶ 4.3, 4.4, 5.7, 5.10.  Plaintiff has submitted evidence that Leonidov was removed as an officer and director and that the Belzbergs were installed as officers and directors.  Dkt. No. 7-23; Alicia Decl. ¶ 19.  On April 24, 2026, the Board of Directors of Virogex, comprised of Sidney and Alicia Belzberg, "acting by unanimous written consent without a meeting," "hereby ratified, approved, and confirmed as of the date of the filing" the instant proceeding.  Dkt. No. 19-15 at 2. The authorization provides prima facie evidence that Virogex has capacity to sue in the instant proceeding.  *See City of Newburgh v. Sarna*, 690 F. Supp. 2d 136, 146 (S.D.N.Y. 2010) (finding capacity to sue after plaintiff submitted a board resolution passed by the relevant body after the Court ordered plaintiff to produce such evidence).

## II.    Likelihood of Success on the Merits

### A.    Trademark Infringement

Plaintiff's first cause of action alleges false designation or origin, false association, and trademark dilution under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125.  Dkt. No. 1 ¶¶ 97–124.  Plaintiff's second cause of action is for false designation of origin under Section 45 of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).  Section 43(a)(a)(A) prohibits the

> use[ ] . . . [of] any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.

15 U.S.C. § 1125(a)(1)(A).

Plaintiff alleges that it has been continuously using the PETMECTIN Word Mark, PETMECTIN Design Mark, PETDAZOLE Word Mark, PETDAZOLE Design Mark, and FISHCYCLINE Word Mark and FISHCYCLINE Design Mark, FLAV-X Word Mark, FLAV-X Design Mark, VIR-X Word Mark, and VIR-X Design Mark (the "Marks") in commerce, that it has priority of usage and superior rights to Defendants, and that Defendants has infringed the Marks.  Dkt. No. 1 ¶¶ 97-124.

Trademark infringement is governed by a "familiar two-prong test."  *Coty Inc. v. Excell Brands, LLC*, 277 F. Supp. 3d 425, 440 (S.D.N.Y. 2017) (quoting *Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 237 (S.D.N.Y. 2012)).  "The test looks first to whether the plaintiff's mark is entitled to protection, and second to whether defendant's use of the mark is likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods."  *Yurman Studio, Inc. v. Castaneda*, 591 F. Supp. 2d 471, 486 (S.D.N.Y. 2008) (quoting *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003) (internal quotation marks omitted)); *see Savin Corp.*

28

*v. Savin Grp.*, 391 F.3d 439, 456 (2d Cir. 2004) ("The crucial issue in an action for trademark infringement is whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." (internal quotation marks and alterations omitted)).

Defendants' principal argument is that Leonidov and not Plaintiff is entitled to the protection of the Lanham Act. They reach that result through two separate but related arguments. First, they claim that Leonidov and not Plaintiff is the rightful owner of the Marks because Leonidov "created, owned, and lawfully controlled the marks, websites, goodwill, and sales channels at issue." Dkt. No. 15 at 3. Second, and relatedly, they argue that the Marks are entitled to weak if any protection in the hands of Plaintiff because "to the extent any of the asserted marks have secondary meaning, that meaning attaches to 2SG (owned by Vas Leonidov)—not to Virogex or Sidney Belzberg." Dkt. No. 15 at 14.

The arguments suffer from the same underlying flaws. Trademark law protects the party who uses a mark in commerce "to identify to identify their goods and services, to distinguish them from others offered in the market, and thereby to develop goodwill," *Jackpocket, Inc. v. Lottomatrix NY LLC*, 645 F. Supp. 3d 185, 236 (S.D.N.Y. 2022), *aff'd*, 2024 WL 1152520 (2d Cir. Mar. 18, 2024), and thus protection inures to the benefit of the first user of the mark in commerce, *see Woodstock Ventures LC v. Woodstock Roots, LLC*, 387 F. Supp. 3d 306, 315 (S.D.N.Y. 2019), *aff'd*, 837 F. App'x 837 (2d Cir. 2021). "Trademark rights 'are not accorded in gross.'" *JC Hosp. v. Hochberg*, 703 F. Supp. 3d 448, 461 (S.D.N.Y. 2023) (quoting *Jackpocket, Inc.*, 645 F. Supp. 3d at 236). It thus is immaterial whether it was Leonidov or Belzberg who "owned" or created the Marks, if in fact, the Marks were first used by Virogex. And, to the extent that Leonidov controlled the use of the Marks, he did so in his capacity as an officer and

29

director of Virogex.  Virogex is entitled to the protection of the Lanham Act because the Marks

identify the goods that Virogex has sold and continues to sell and protects the goodwill it has

developed.  The consumer need not know that it is Virogex that has sourced and sold the

products.  It is sufficient that the Marks distinctively identify the goods that Virogex alone—until

ResolvX came along—has sold.

### 1.    Entitlement to Protection/Ownership of the Trademarks

Defendants first argue that Plaintiff did not create the Marks and does not own or control

them.  Dkt. No. 15 at 3–4.[14]  "Trademark ownership is a 'necessary element' of a trademark

infringement claim [.]"  *Ripple Analytics Inc. v. People Ctr., Inc.*, 153 F.4th 263, 268 (2d Cir.

2025) (quoting *Island Software & Comput. Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 259 (2d

Cir. 2005)).  "[O]nly the owner of the trademark is entitled to sue for its infringement."  *Fed.

Treasury Enter. Sojuzplodoimport v. SPI Spirits Ltd.*, 726 F.3d 62, 75 (2d Cir. 2013) (quotation

marks omitted).[15]

Defendants' argument is best understood to raise a question of "first use."  "[E]xclusive

rights in a trademark are acquired not by registration, but through prior appropriation and use."  *4*

*Pillar Dynasty LLC v. Saucony, Inc.*, 2017 WL 1906868, at *4 (S.D.N.Y. May 8, 2017).

Accordingly, "'[t]he user who first appropriates the mark obtains an enforceable right to exclude

others from using it, as long as the initial appropriation and use are accompanied by an intention

---

[14] Defendants have not meaningfully contested nor offered an evidence that would support a finding contrary to one that Virogex is the rightful owner of the Virex Health and Virogex marks.

[15] An unregistered mark "is entitled to protection under the Lanham Act if it would qualify for registration as a trademark."  *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 381 (2d Cir. 2005).  As discussed below, Defendants do not dispute that the Marks are at least descriptive and have acquired secondary meaning, albeit they contend that the secondary meaning links the Marks to them and not to Plaintiff.  Thus the Marks are entitled to protection under the Lanham Act.

to continue exploiting the mark commercially.'" *H.W. Carter & Sons, Inc. v. William Carter Co.*, 913 F. Supp. 796, 802 (S.D.N.Y. 1996) (quoting *La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1271 (2d Cir. 1974)). A mark is used in commerce when it is employed "to identify . . . goods or services" sold to consumers "in a given market." *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 147 (2d Cir.), *cert. denied*, 552 U.S. 827 (2007); *see American Express Co. v. Goetz*, 515 F.3d 156, 161 (2d Cir. 2008) ("there can be no trademark absent goods sold."). "As to ownership, the 'party who first uses a mark in commerce is said to have priority over other users.'" *One Step Up, Ltd. v. Empire Apparel LLC*, 2026 WL 691063, at *7 (S.D.N.Y. Feb. 2, 2026) (quoting *Hana Financial, Inc. v. Hana Bank*, 574 U.S. 418, 419 (2015)); *see also B&B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 142 (2015); 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 16:18 (4th ed. 2010) (Trademark ownership rights belong to the "first-to-use, not [the] first-to-register"). There is no serious question that Virogex enjoys priority of use to each of the Marks over ResolvX. Virogex first used the VIR-X mark on or about August 26, 2021. Sydney Decl. ¶ 15; Dkt. No. 7-17. On or about April 23, 2023, Virogex began selling PETMECTIN branded products under the Virex Health brand name. Sidney Decl. ¶ 19; Dkt. No. 7-18. On or about June 6, 2023, Virogex began selling PETDAZOLE branded products under the Virex Health brand name. Sidney Decl. ¶ 22; Dkt. No. 7-19. On or about October 4, 2023, Virogex began selling FISHCYCLINE branded products under the Virex Health brand. Sidney Decl. ¶ 25; Dkt. No. 7-20. Finally, on or about December 19, 2024, Virogex began selling FLAV-X branded products. Sidney Decl. ¶ 28; Dkt. No. 7-21. Virogex was created in September of 2020. Dkt. No. 16 ¶ 2. From that time through 2025, Leonidov served as the President, Treasurer,

31

Secretary, and Director of Virogex.  Dkt. No. 16 ¶ 4.  The products at issue were sourced by Virogex, marketed by Virogex, and sold by Virogex.  Leonidov was a mere fiduciary.

Moreover, even though there was a brief break in the sales of Virogex's products from April 25 to June 15, while Defendants had prevented the virex.health website from operating on the server that previously hosted it, Tr. at 24:5–10, there is no evidence that Virogex ever abandoned the intent to use the Marks.  See *Defiance Button Mach. Co. v. C & C Metal Prods. Corp.*, 759 F.2d 1053, 1060 (2d Cir. 1985) (explaining that a temporary cessation does not indicate abandonment, and that even cessation for a period longer than two years may be rebutted).  Rather, it continued to attempt to exploit the Marks, and immediately began sales again once the website was up and running in June.  Dkt. No. 26-11.

Defendants argue that Leonidov and not Virogex enjoys priority of use because Leonidov took the first crack at the design of the packaging and because, after April 2023, the Virogex products were primarily promoted through and sold on Leonidov's Substack.  Alexander opines that "[t]he audience for these products was not merely purchasing anonymous goods from a corporate entity.  The products were promoted to an audience that followed Vas and 2SG."  Alexander Decl. ¶ 13.  Yates opined that "sales were driven solely by Vas's 2SG Substack Newsletter, which was the sole marketing, advertising, and sales channel, recognized by industry experts and the customer base as the sole source of origin for these products," Yates Decl. ¶ 21, and Ansari opined that customers "associated the products with 2SG, Vas, and the Virex Health brand," and that the "purchasing audience viewed" the 2SG Newsletter "as the single source for those products," Ansari Decl. ¶¶ 35–43.  There are disputed questions regarding the extent to which Leonidov should enjoy credit for the design of the packaging; both Leonidov and the Belzbergs had a role in the packaging.  There is no dispute that Leonidov promoted the products

32

at issue through his Substack page 2SG and that the promotion of the products through his Substack drove sales after April 2023.  But Leonidov engaged in the design and promotion efforts in his capacity as an officer and director of Virogex.  Leonidov's March text messages and emails establish as much.  He threatens that if Belzberg does not accede to his demands, he will "wind this company [Virogex] down and I will restart a new one," PX-2, and claims that he is the one who "responsibly buil[t] this company out," PX12.  The goodwill is that of Virogex and not that of any of its shareholders or officers or directors individually.

"[I]t is well-settled that 'if an employee designs a mark in the course of employment and the employer uses it, . . . the employer is the owner of the mark.'"  *Market News Int'l, Inc. v. Rosenberger*, 2006 WL 8461850, at *6 (S.D.N.Y. Nov. 1, 2006) (quoting J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 16:36 (4th ed. 2006)); *cf. Marks Org., Inc. v. Joles*, 784 F. Supp. 2d 322, 328 (S.D.N.Y. 2011) ("A sale of a business and its goodwill carries with it the sale of the trade-mark used in connection with the business.") (quoting *President Suspender Co. v. Macwilliam*, 238 F. 159, 162 (2d Cir. 1916)); *In re 96 Wythe Acquisition, LLC*, 669 B.R. 238, 250 (S.D.N.Y. 2025).  "Mere conception of the term gives no trademark rights and it is the actual use in connection with a particular business that is required." *Montgomery v. Kalak Water Co. of N.Y., Inc.*, 196 F. Supp. 173, 177 (S.D.N.Y. 1961) (citation omitted); *see also* 3 Callmann on Unfair Competition § 20:2 (4th ed.) ("Where an employee creates matter usable as a mark as part of that employee's employment duties, and the mark is then used by the employer, the mark presumably belongs solely to the employer.").  That is because "[o]ne acquires rights in a particular mark not merely by adopting it, but by using it in connection with an ongoing business." *G's Bottoms Up Social Club v. F.P.M. Indus., Inc.*, 574 F. Supp. 1490, 1495 (S.D.N.Y. 1983); *see also id.* ("any trademark rights in the Candle name and

logo which existed at the time the Old Candle was in operation were right of Candle Light

Tavern, Inc., as owner and operator of the bar, and not of MacDonnell.").  The law thus is clear

that Leonidov's "use" of the marks is attributable to Virogex for the purposes of trademark

ownership.  The only "ongoing business" at the time Leonidov helped in developing and

marketing the products at issue was Virogex.

  Defendants' reliance on *Lyons v. American College of Veterinary Sports Medicine and

Rehabilitation*, 859 F.3d 1023 (Fed. Cir. 2017) and *Covertech Fabricating, Inc. v. TVM Building

Products, Inc.*, 855 F.3d 163, 171–73 (3d Cir. 2017), is unavailing.  Both cases looked to "first

use" to determine ownership of a challenged mark, just as this Court does.  *See Lyons*, 859 F.3d

at 1027 ("It is axiomatic in trademark law that ownership of a mark is predicated on priority of

use in commerce"); *Covertech*, 855 F.3d at 170 ("The first use test is generally proper for

unregistered trademarks").  Each involved parties in a different legal relationship than those here.

*Lyons* involved a dispute between a membership group and a departing member of that group.

*Covertech* involved a dispute over the ownership of a mark between the manufacturer of a

product sold under a mark and its exclusive distributor that sold the product to consumers.  The

analysis of each, however, is consistent with the result that the Court reaches here.  In *Lyons*, the

court identified three relevant main factors to be considered in determining ownership between a

group and the departing member of a group: "(1) the parties' objective intentions or expectations;

(2) who the public associates with the mark; and (3) to whom the public looks to stand behind

the quality of goods or services offered under the mark."  859 F.3d at 1029.  The *Lyons* court

affirmed a ruling for the group and not the individual member because the collective intent of the

parties was that the group would use the mark and not that the individual would use it for "her

own personal services," *id.* at 1030, the individual had not used the mark for "herself or her

34

wholly-owned nonprofit organization," *id.* at 1031, and members of the public looked to the organization for quality control, *id.* at 1031–32.  In *Covertech*, the court adopted Professor McCarthy's test for determining trademark ownership between a manufacturer and its exclusive distributor where no contract exists.  855 F.3d at 171.  The manufacturer is the presumptive trademark owner unless the distributor rebuts that presumption using a multi-factor balancing test designed to examine the distribution agreement in effect between the parties and which looks to the party who (1) invented or created the mark, (2) first affixed the mark to goods sold, (3) the party whose name appeared on the packaging and promotional materials in conjunction with the mark, (4) who exercised control over the name and quality of the good, (5) to whom customers looked as standing behind the good, and (6) who paid for the advertising and the promotion of the trademarked product.  *Id.* at 171.  The court in *Covertech* affirmed a ruling for the manufacturer.  *Id.* at 173–74.

Even if viewed through the lens of either *Lyons* or *Covertech*, ownership of the mark would belong to Plaintiff.  Under *Lyons*, the joint understanding of Plaintiff and of Leonidov was that Leonidov was working for Virogex and not for himself individually.  The understanding was that the products under which the Marks were sold were sold by Virogex, that Virogex incurred the expenses and received the revenue, and that Virogex's officer (Leonidov) and its owners (the Belzbergs) were to share equally in the profits generated by the company.  The parties associated the Mark with Virogex—the company who sold the products.  While the public may have associated the products with the 2SG platform, there is no evidence it affirmatively understood Leonidov to be selling those products as an individual rather than in a capacity as an officer of a company.  And the public would have looked to Virogex, which sourced the products, for the quality of the goods and services.  Under *Covertech*, Virogex would be in the position of

manufacturer (it sourced the products) and Leonidov, at most, in the position of distributor.  The Marks were created by Leonidov (with the Belzbergs) on behalf of Plaintiff, Plaintiff first affixed the Marks to the goods sold, Plaintiff's name appeared on the packaging, and Plaintiff controlled the product and also controlled the Marks in that after Leonidov designed the Marks he presented them to Sidney Belzberg for approval.  While the market might have looked to Leonidov as standing behind the product, it was again in his capacity as an officer and director of Plaintiff.

**2.    Virogex has established a likelihood of success on the merits that is the owner of the Marks.    Likelihood of Confusion**

The second step of the Lanham Act analysis requires the Court to consider the eight factors set forth by Judge Friendly in *Polaroid v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir. 1961): (1) the strength of the plaintiff's mark, (2) the degree of similarity between the two marks, (3) the proximity of the parties' areas of commerce, (4) the likelihood that the plaintiff will bridge the gap separating their areas of activity, (5) actual consumer confusion, (6) whether the defendant acted in bad faith or was otherwise reprehensible in adopting the mark, (7) the quality of the defendant's product, and (8) the sophistication of the relevant consumer group. Defendants do not seriously contest the degree of similarity between the Marks and Defendants' marks, the proximity of the parties' area of commerce, the likelihood of bridging the gap, the evidence of actual consumer confusion, and the factor of consumer sophistication.  Dkt. No. 15 at 21–24.  The two companies are using the same marks to sell the same products to a consumer group that purchases products that "are relatively inexpensive and [where] confusion is more likely" and actual confusion exists because the two companies are "us[ing] the same customer channels and goodwill." *Id.*  Defendants admit that "both sides are competing over the **same business, same products, same customer base, and same goodwill**." *Id.* at 22 (emphasis in original).  Defendants' main argument is that the Marks are descriptive and therefore protectable

only if they have acquired "secondary meaning," *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985), and that the secondary meaning attaches to 2SG and Leonidov and not to Plaintiff.  This is just Defendants' ownership argument in a different garb.

"The strength of a trademark is assessed based on either or both of two components: (1) the degree to which it is inherently distinctive; and (2) the degree to which it has achieved public recognition in the marketplace, sometimes called acquired strength." *RiseandShine Corp. v. PepsiCo, Inc.*, 41 F.4th 112, 120 (2d Cir. 2022).  Inherent strength is measured by which of four categories best describes the mark: generic, descriptive, suggestive, and arbitrary or fanciful.  *See Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976).  "Descriptive marks are presumptively unprotectable, but can acquire a degree of protection if they have acquired secondary meaning, *i.e.* an acquired public recognition as a mark identifying the source," while arbitrary and fanciful marks enjoy protection without the need to show secondary meaning.  *RiseandShine Corp.*, 41 F.4th at 121.

The parties squabble over whether the Marks are descriptive or fanciful.  Defendants argue that each of the Marks is descriptive, Dkt. No. 15 at 13, while Plaintiff argues that they are fanciful, Dkt. No. 7-31 at 12.  The Court need not resolve that issue to decide this motion.  Defendants do not dispute that the Marks have acquired secondary meaning, that is, that the Marks would be protectible in the hands of Defendants.  They argue only that the secondary meaning identifies Leonidov as associated with the products and not Virogex.  Defendants' argument fundamentally misunderstands the secondary meaning inquiry.

"[T]he crux of the doctrine of secondary meaning 'is that the mark comes to identify not only the goods but the source of those goods,' even though the relevant consuming public might not know the name of the producer." *Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*, 830

F.2d 1217, 1221 (2d Cir. 1987) (quoting *20th Century Wear, Inc. v. Sanmark-Stardust Inc.*, 815 F.2d 8, 10 (2d Cir.1987)); *see* 3 R. Callmann, The Law of Unfair Competition Trademarks and Monopolies § 19.25, at 81–82 n. 7 (L. Altman 4th ed. 1983) ("It suffices if consumers accept the trademark as an indication of origin."). That is, for the purposes of whether a mark has acquired a secondary meaning it is unimportant if the consumers of a good do not know the name of the corporation that owns the mark at issue; it matters only that they associate it with a single source. *See N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 331 (S.D.N.Y. 2010) ("Thus, the fact that the public is probably unaware of the existence of a limited liability corporation registered as New York City Triathlon LLC does not negate the Court's prior finding of secondary meaning."). The consuming pubic need not know, for example, that Kleenex is manufactured and sold by the Kimberly-Clark Corporation for that company to have a protectable right to the Kleenex mark. It is sufficient that the public associates the product that is sold as Kleenex with a distinctive manufacturer that sells the Kleenex product. Plaintiff readily satisfies that standard.

The evidence as presented by both parties in this case is that the marks at issue for PETMECTIN, PETDAZOLE, and FISHCYCLINE are associated with a single source, and have therefore acquired secondary meaning. Although consumers may think that source to be 2SG or Virex Health, that does not change the fact that the marks use by Virogex in the sale of Virogex products have a secondary meaning making them protectable. Sidney Belzberg testified that "consumers all over the United States, including New York, have come to associate Virogex's VIR-X, PETMECTIN, PETDAZOLE, FISHCYCLINE, and FLAV-X branded products with the 'Virex Health' brand name." Belzberg Decl. ¶ 36. Leonidov long served as an important part of the company, who worked to promote the products, "for the benefit of Virogex," on his Substack

page, 2SG. *Id.* ¶ 9. The evidence demonstrates that he did his job well, and that consumers purchased the product due to its promotion by Leonidov and his 2SG Substack. *See* Ansari Decl. ¶ 34 (explaining that "the customer base was overwhelmingly composed of members of the 2SG audience); Yates Decl. ¶ 12 ("all meaningful customer demand for these products . . . originated from Vas Leonidov's 2SG Substack Newsletter Audience."); Alexander Decl.¶ 13 ("I always associated all the products he promoted as being his and inextricably linked to the 2SG Substack Newsletter and no one else. I believe all who read 2SG stack and were also interested in the products . . . knew that if you wanted the products, you go to 2SG stack to order."). With the departure of Leonidov, Virogex may have lost his marketing prowess and the benefit of the 2SG platform. It did not lose the goodwill that had been developed through the use of that platform.

The remaining factors also support Plaintiff's claim of infringement. As noted, Defendants do not dispute the marks are identical, the products offered by Plaintiff and Defendants are identical, and that the consumers for the products are not sophisticated.[16] Defendants argue that they have acted in good faith because Leonidov "founded Virogex, held all officer roles, owns 50% of the company, controlled the board of directors, created the marks and packaging, controlled the website infrastructure, never assigned the marks, and was . . . locked out of the website" by the Belzbergs. Dkt. No. 15 at 24. The bad faith factor, however,

---

[16] The mere addition of the "ResolvX" brand name rather than the Virex Health brand name does not protect Defendants from infringement. The actual mark at issue—that for the underlying product, is identical. *See Essie Cosms. Ltd. v. Dae Do Intern., Ltd.*, 808 F. Supp. 952, 959 (E.D.N.Y. 1992) ("The mere addition of a second mark, such as a label, may 'not dissipate the confusion engendered through the use of the infringing mark.'") (quoting *Source Perrier S.A. v. Waters of Saratoga Springs, Inc.*, 1982 WL 51044, at *3 (S.D.N.Y. Dec. 9, 1982)). The "crucial determinant" remains "'whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Pirone v. MacMillan, Inc.*, 894 F.2d 579, 584 (2d Cir. 1990) (quoting *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.1978)).

examines "whether the defendant adopted its mark with the intention of capitalizing on [the] plaintiff's reputation and goodwill and [on] any confusion between his and the senior user's product." *Savin Corp.*, 391 F.3d at 460 (internal quotation marks omitted).  It does not focus on whether the defendant believed he was entitled to use of the mark or not.[17]  It also is not "of high relevance to the issue of likelihood of confusion." *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 151 (2d Cir. 2003).  "In situations where 'the defendant is aware of the existence of plaintiff's mark and proceeds to use it . . . a finding of 'bad faith' has been inferred.'" *Mintable Pte. Ltd. v. Mintology Inc.*, 2024 WL 3454825, at *8 (S.D.N.Y. July 18, 2024) (quoting *Caliko, SA v. Finn & Emma, LLC*, 2022 WL 596072, at *13 (S.D.N.Y. Feb. 28, 2022)).  And, while Defendants dispute that their product is of inferior quality to that of Plaintiff, "[t]he issue of the quality of the secondary user's product goes more to the harm that confusion can cause the plaintiff's mark and reputation than to the likelihood of confusion." *Id.* at 152.  In essence, this case is like a counterfeit case, where "it may be 'unnecessary to perform the step-by-step examination of each *Polaroid* factor,' [because] 'the goods are also identical and directly competitive.'" *Chrome Hearts LLC v. Controse Inc.*, 2023 WL 5049198, at *12 (S.D.N.Y. Aug. 8, 2023) (quoting *Philip Morris USA Inc. v. Felizardo*, 2004 WL 1375277, at *5 (S.D.N.Y. June 18, 2004)).

### B.  False Advertising

Plaintiff's third cause of action alleges false advertising in violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).  Dkt. No. 1 ¶¶ 139–49.  That section proscribes false or misleading descriptions or representations of fact concerning "the nature, characteristics,

---

[17] The defendants' willfulness, *i.e.*, whether the defendants acted with reckless disregard for or willful blindness to the plaintiff's trademark rights, by contrast, does go to the question of statutory damages. *See McGraw Hill LLC v. Doe 1*, 616 F. Supp. 3d 316, 330 (S.D.N.Y. 2022).

qualities, or geographic origin of . . . goods, services, or commercial activities."  15 U.S.C. § 1125(a)(1)(B).  Plaintiff seeks injunctive relief on that claim.

The Lanham Act does not regulate "all commercial speech," but it does "encompass[] more than the traditional advertising campaign."  *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2d Cir. 2002).  "Thus, the touchstone of whether a defendant's actions may be considered "commercial advertising or promotion" under the Lanham Act is that the contested representations are part of an organized campaign to penetrate the relevant market."  *Id.*  "Stated succinctly, the elements of a Lanham Act claim require a plaintiff to demonstrate that the defendant's advertising message (1) is false, either literally or impliedly, (2) is material, and (3) causes or is likely to cause injury to plaintiff."  *Church & Dwight Co., Inc. v. SPD Swiss Precision Diagnostics, GmbH*, 2015 WL 4002468, at *17 (S.D.N.Y. July 1, 2015) (citing *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 255 (2d Cir. 2014)); *accord JC Hosp. v. Hochberg*, 2025 WL 3124313, at *15 (S.D.N.Y. Nov. 7, 2025).  Plaintiff argues that Defendant has violated this provision of the Lanham Act by falsely advertising that RexolvX is a "rebrand" of Virex Health and the sole legitimate source of Virogex's products.  Dkt. No. 7-31 at 17–18.

Falsity may be shown by proving that (1) the advertising is "literally false as a factual matter," or (2) it is impliedly (i.e., misleadingly) false, which means that, "although the advertisement is literally true, it is likely to deceive or confuse consumers."  *Merck*, 760 F.3d at 255 (quoting S.*C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 238 (2d Cir. 2001)); *see Time Warner Cable, Inc. v. DIRECTV*, Inc., 497 F.3d 144, 148, 158 (2d Cir. 2007).  If "an advertising [message] is literally false, the court may enjoin the use of the [message] without reference to the advertisement's impact on the buying public."  *Merck*, 760 F.3d at 256 (quoting

41

*Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93, 112 (2d Cir. 2010)).  On materiality, the Second Circuit requires a plaintiff to show that "the defendants misrepresented an inherent quality or characteristic of the product."  *Merck*, 760 F.3d at 255 (citing *S.C. Johnson*, 241 F.3d at 238).  And finally, injury turns on "whether it is likely that [defendant's] advertising has caused or will cause a loss of [plaintiff's] sales, not whether [plaintiff] has come forward with specific evidence that [defendant's] ads actually resulted in some definite loss of sales."  *Johnson & Johnson v. Carter–Wallace, Inc.*, 631 F.2d 186, 190 (2d Cir. 1980) (citing *Parkway Baking Co. v. Freihofer Baking Co.*, 255 F.2d 641, 649 (3d Cir.1958)).

On the record before the Court for the preliminary injunction, Plaintiff has demonstrated a likelihood of success on the merits as to their false advertising claim.  First, as elaborated in the Findings of Fact, ResolvX falsely advertises itself as a "rebrand" of Virex Health, or as the sole legitimate distributor of the products distributed by Virogex.  It is not.  Virex Health subsists.  It continues to sell the same products it sold before.  There is simply a change in management and board membership.  ResolvX is not a rebrand.  It is a completely distinct corporation, founded by Leonidov, and of which he is the sole owner.  Tr. at 123:25–124:5 (Leonidov answers "that is correct" to the question "you're the sole owner of ResolvX health, correct?").

Second, that the ResolvX products are the inheritors-in-interest of the Virex Health products is an inherent quality or characteristic of the product; a consumer's belief of that fact is "likely to influence purchasing decisions."  *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 855 (2d Cir. 1997) (quoting *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1428 n.9 (3d Cir. 1994)).  As much is evidenced by the emails submitted as evidence from confused consumers, who indicated that they purchased products on the understanding that they were the same Virex Health products they were aware of.  *See, e.g.*, Dkt. No. 7-27 at 3

(consumer explaining that they "received an email from a company claiming to be rebranding

Virex products" and asking for clarification if that is legitimate); *id.* at 11 (consumer explaining

that they have "purchased Petmectin from Virex Health over the past two or three years" and is

"now seeing ResolvX Health name in the exact same advertising including the phrase" that

"Virex Health is now ResolvX Health"); Dkt. No. 16-23 at 8 (consumer complaining about the

"FAKE" Virex company); *id.* at 14 (consumer explaining that they learned the previous Virex

Health website had been compromised).

Finally, the false advertisement that ResolvX health is the successor of Virex

Health/Virogex will likely cause Virogex to lose sales.  It is not contested that Leonidov drove a

significant portion of Virogex's sales through is 2SG Substack.  It is therefore likely that his

statements on that Substack (and on the ResolvX website he now advertises thereon) that

ResolvX is the rebranded Virex Health and that the Virogex products are illegitimate will cause a

shift of sales from Plaintiff to Defendants by those who are falsely deceived by the claim that

ResolvX is Virogex.  *See Lexmark Intern., Inc. v .Static Control Components, Inc.*, 572 U.S. 118,

133 (2014) (loss "occurs when deception of consumers causes them to withhold trade from the

plaintiff.").  Defendants may sell products of the same chemical composition as those of Virogex

and may advertise that they are sold by the prior Chief Executive Officer of Virogex.  What they

may not do is advertise themselves as Virogex, imply that their products are the same as Virogex

or sponsored by Virogex, or use the Marks that Virogex has used.

### C.      Cybersquatting

Plaintiff also moves for preliminary injunctive relief on their claim under the

Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d).  That statute was

passed by Congress in part "to protect consumers and American businesses" from "the bad-faith

and abusive registration of distinctive marks as Internet domain names with the intent to profit

from the goodwill associated with such marks—a practice commonly referred to as 'cybersquatting.'" *Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489, 495 (2d Cir. 2000). To allege a cybersquatting claim, a plaintiff must show (1) that the infringed-on mark is "distinctive or famous"; (2) that the domain name is "identical or confusingly similar to" the mark; and (3) that the alleged cybersquatter acted with a "bad faith intent to profit." *Id.* at 497–99. Plaintiff bases this claim on its claim that, following the breakdown in relationship between Leonidov and the Belzbergs, Leonidov purchased the domain name virogex.com and used that website to post false claims that "Virex Health" has rebranded to "ResolvX Health," and to redirect traffic to www.resolvx.health. Sydney Decl. ¶ 45; Dkt. No. 7-24 (printout of website).

Plaintiff has not introduced any evidence that would permit the Court to make a finding of fact that Defendants in fact purchased or registered the domain name virogex.com. Sidney Belzberg testifies only that he "believes" that Leonidov registered the domain name for virogex.com. Sidney Decl. ¶ 45. Plaintiff elicited no testimony at the evidentiary hearing on this issue. The request for a preliminary junction on this cause of action is denied.

### D.    Trade Dress Infringement

Finally, Plaintiff moves for preliminary injunctive relief on its claim that the ResolvX website has infringed on the trade dress of the Virex.Health website. Trade dress is "the design and appearance of the product as well as that of the container and all elements making up the total visual image by which the product is presented to consumers." *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 31 (2d Cir.1995). A claim for trade dress infringement arises under § 43(a) of the Lanham Act, and requires a showing that (a) plaintiff's trade dress is entitled to protection under the Act, and (b) the defendant's dress infringes on the plaintiff's dress by creating a likelihood of confusion. *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 377 (2d Cir.1997). To be entitled to protection, plaintiff's trade dress "must either

be inherently distinctive or be shown to have acquired distinctiveness through 'secondary meaning.'" *Id.* (quoting *Two Pesos v. Taco Cabana, Inc.*, 505 U.S. 763, 774 (1992)).

At the evidentiary hearing, Plaintiff did not present or develop any evidence about the design of the website. Plaintiff elaborated on the claim in only a single page of their motion for a preliminary injunction. Dkt. No. 7 at 19–20. Plaintiff has not demonstrated a likelihood of success on the merits of their trade dress infringement claim.[18]

### III.    Irreparable Harm

Section 1116 of Title 15 grants a court the power "to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right" under Section 1125(a). 15 U.S.C. § 1116(a). It continues that "[a] plaintiff seeking an injunction shall be entitled to a rebuttable presumption of irreparable harm . . . upon a finding of likelihood of success on the merits for a violation identified in this subsection in the case of a motion for a preliminary injunction[.]" *Id.* "Any party seeking a preliminary injunction 'must demonstrate that it will suffer irreparable harm in the absence of the requested relief.'" *Sussman v. Crawford*, 488 F.3d 136, 140 (2d Cir. 2007) (quoting *Latino Officers Ass'n v. Safir*, 170 F.3d 167, 171 (2d Cir. 1999)). Irreparable harm is "harm that (a) occurs to the parties' legal interests and (b) cannot be remedied after a final adjudication, whether by damages or a permanent injunction." *Salinger*, 607 F.3d at 81. "Irreparable harm 'exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark pending trial,' because loss of control over one's reputation is neither 'calculable nor precisely compensable.'" *Museum of Modern Art v. MOMACHA IP*

---

[18] Additionally, the Court sees no need to address Plaintiff's claim against Leonidov for aiding and abetting. Dkt. No. 7 at 20. The Court has already determined that Plaintiff has demonstrated a likelihood of success on the merits as against the corporate and individual defendants.

*LLC*, 339 F. Supp. 3d 361, 382 (S.D.N.Y. 2018) (quoting *N.Y.C. Triathlon*, 704 F. Supp. 2d at 343).  Moreover, "[w]here a mark warrants protection under the Lanham Act, 'both the likelihood of success on the merits and the potential for irreparable harm in the absence of preliminary relief may be demonstrated by a showing that a significant number of consumers are likely to be misled or confused as to the source of the products in question.'" *RiseandShine Corp.*, 41 F.4th at 119 (quoting *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1038 (2d Cir. 1992)).  Courts in this District have recently held that the Trademark Modernization Act of 2020 shifts the burden of persuasion to the defendant in a trademark infringement case, thereby undermining *eBay Inc. v. MerxExchange, L.L.C.*, 547 U.S. 388 (2006).  *See Hermes International v. Rothschild,* 678 F. Supp. 3d 475, 489 (S.D.N.Y. 2023); *see also Mintable Pte. Ltd.*, 2024 WL 3454825, at *11.

With or without a presumption of irreparable harm, Plaintiff is entitled to a finding of irreparable harm on the record here.  Plaintiff has demonstrated that if the infringing conduct were to continue, Virogex would be "irreparably harmed by ceding" to ResolvX "its reputation and goodwill." *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 511 F. App'x 81, 85 (2d Cir. 2013) (summary order).  Such "loss of reputation or goodwill" is "often sufficient in trademark cases to show irreparable harm." *Stringer v. Simon & Schuster, Inc.*, 2025 WL 2549159, at *3 (S.D.N.Y. Sept. 4, 2025) (collecting cases).  Nor is Plaintiff's claim that it will suffer such an injury based on mere "conclusory statements." *Algood Casters Ltd. v. Caster Concepts, Inc.*, 2020 WL 5274172, at *4 (S.D.N.Y. Sept. 4, 2020).  The infringing products sold by Defendants are, other than the brand name, identical to the products sold by Plaintiff.  To that end, the parties have each put in evidence both in the form of their testimony and in the form of emails from customers demonstrating confusion as to the rightful owner of the marks.  This "loss of control

46

over the quality of products" bearing Virogex's marks "constitutes textbook irreparable harm." *3M Co. v. CovCare, Inc.*, 537 F. Supp. 3d 385, 403 (E.D.N.Y. 2021).  That loss of control "is neither calculable nor precisely compensable."  *City of New York v. Lopez*, 2021 WL 6063839, at *4 (S.D.N.Y. Dec. 21, 2021) (citation omitted).

Defendants argue that Plaintiff has nevertheless failed to meet their burden on irreparable injury because they waited until April 17, 2026, to file the federal action despite knowing that ResolvX was selling infringing products since mid-2025.  Dkt. No. 15 at 21.  Delay is a significant factor that a court must weigh in evaluating irreparable harm.  *See ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C.*, 314 F.3d 62, 67 (2d Cir. 2002) ("We have long held in the context of trademark actions that where a person entitled to exclusive use of a trademark is guilty of unreasonable delay in asserting his rights against an infringer . . . a court of equity has the discretionary power . . . to deny injunctive relief.") (quoting *Carl Zeiss Stiftung v. VEB Carl Zeiss Jena*, 433 F.2d 686, 703 (2d Cir. 1970)).  [T]he failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief."  *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995).  Unexplained delay tends to suggest "that the owner of the mark or right had concluded that there was no infringement but later brought an action because of the strength of the commercial competition."  *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 39 (2d Cir. 1995).  A party who, without justification, holds back on filing a trademark infringement lawsuit, ordinarily will not be heard to complain if a court itself delays in granting injunctive relief until after a full trial on the merits.  "The movant's lack of urgency in protecting its rights undermines

47

its claim that the Court should act urgently to protect those rights." *Algood Casters*, 2020 WL 5274172, at *3.[19]

However, "the Court of Appeals has not yet held that unexcused delay alone necessarily defeats a preliminary injunction motion." *Marcy Playground, Inc. v. Cap. Records, Inc.*, 6 F. Supp. 2d 277, 282 (S.D.N.Y.1998) (citing *Tough Traveler, Ltd.*, 60 F.3d at 969 (Jacobs, J., concurring) ("[The rule] does not preclude preliminary relief even if the district court finds unexcused delay.  Delay is just one of several factors to consider.")).  The question is not simply whether the plaintiff has delayed, but the reason for such delay.  *See Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 144 (2d Cir. 2005).  "[A] delay in filing suit will not rebut the presumption of irreparable harm if the plaintiff does not know how severe the infringement is." *Tom Doherty Assocs.*, 60 F.3d at 39.  "Similarly, a delay caused by a plaintiff's good faith efforts to investigate an infringement does not rebut the presumption of irreparable harm." *Id.*; *see also Marsh & McLennan Co. v. Howden US Servs., LLC*, 2026 WL 508603, at *11 (S.D.N.Y. Feb. 24, 2026) (plaintiff "has provided a credible explanation for its delay in seeking injunctive relief," including that it continued further investigation into the infringement).  To that end, courts have excused delay when the plaintiff, instead of bringing suit, attempted to resolve the matter consensually.  *See Weight Watchers*, 423 F.3d at 145; *King v. Innovation Books,* 976 F.2d 824, 831 (2d Cir.1992) (author's eight month delay in seeking injunction against a movie studio regarding dispute over movie credits excusable where the author contacted the studio and

---

[19] Delay in the context of irreparable harm is distinct from the affirmative defense of laches.  To prove laches, the party asserting that the delay should preclude equitable relief "must establish that it was prejudiced by the delay." *Majorca, S.A. v. R.H. Macy & Co., Inc.*, 762 F.2d 7, 8 (2d Cir. 1985).  By contrast, lack of diligence even without evidence of prejudice may "preclude the granting of preliminary injunctive relief, because it goes primarily to the issues of irreparable harm rather than occasioned prejudice." *Id.*

48

repeatedly objected to the credits); *Clifford Ross Co. v. Nelvana, Ltd.,* 710 F. Supp. 517, 521 (S.D.N.Y. 1989) (seven month delay in filing not unreasonable because the intervening period involved constructive effort to resolve the dispute without litigation).

Plaintiff's conduct since learning of Defendants' infringement and before bringing this lawsuit does not bespeak a lack of urgency. First, Plaintiff took steps to undo the damage that Leonidov caused to it upon his departure from the company. Because Leonidov terminated the virex.health website's server connection on the Linode server upon his termination, Alicia Belzberg was required to rebuild the website using a different server, Amazon Web Services. Tr. at 24:1–23; 90:4–23. Because Leonidov also shut out the Belzbergs from the Virogex bank account, Alicia Belzberg had to open a new bank account for the company. Alicia Decl. ¶ 23. Virogex was required to re-purchase the company's inventory, as what it possessed at the time of the breakup was retained by Leonidov. *Id.* ¶ 29. In May through July, Virogex applied to the USPTO to register its Marks. Sidney Decl. ¶ 50. Because Leonidov, following his removal, also purported to dissolve Virogex in July 2025, Alicia Belzberg was required to take steps to revoke the dissolution of the company. Alicia Decl. ¶ 23.

Second, Virogex did not simply sit on its hands in the face of Defendants' infringement. It took action, albeit action that was ineffective. Upon revocation of Leonidov's attempted dissolution, the Belzbergs filed suit in state court to attempt to retrieve what they viewed as stolen inventory and to prevent unfair competition. *See* Dkt. Nos. 16-12–15. Though that suit was unsuccessful, in part, because it was brought not by Plaintiff but by Plaintiff's owners and because it did not assert federal trademark infringement claims, the Court cannot say that Plaintiff acquiesced in Defendants' wrongdoing. Nor is this a case where Defendants, in view of Plaintiff's silence, would have acquired some reliance interests in its continued infringement.

49

Defendants were on notice from the beginning of Plaintiff's claim to superior rights to the Marks.  Finally, upon Leonidov's opposition to Virogex's USPTO applications, Dkt. Nos. 7-3–7-10, his marketing of a new product using the PETMECTIN mark, Dkt. No. 7-30, and continued customer confusion, Dkt. No. 7-28, Plaintiff sent a cease-and-desist letter to Defendants on March 27, 2026.  Dkt. No. 16-2.  When the infringing conduct continued, Virogex promptly moved for injunctive relief under the Lanham Act in this Court.

In context, then, the delay is not a bar to the preliminary equitable relief sought by Plaintiff.  The "presumption that infringement alone will cause irreparable harm pending trial" has not been "neutralized" by delay, *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985), because Plaintiff "was actively pursuing its rights," *Kuklachev v. Gelfman*, 629 F. Supp. 2d 236, 250 (E.D.N.Y. 2008).  Plaintiff, which is not a sophisticated litigant, pursued relief through various means almost immediately upon the start of the infringing conduct.  The evidence cannot possibly yield to the conclusion "that the plaintiff may have acquiesced in the infringing activity or that any harm suffered is not so severe as to be irreparable."  *New Look Party Ltd. v. Louise Paris Ltd.*, 2012 WL 251976, at *10 (S.D.N.Y. Jan. 11, 2012) (quoting *Richard Feiner & Co. v. Turner Entm't Co.*, 98 F.3d 33, 34 (2d Cir. 1996)).

Because Plaintiff has established that its delay in bringing suit neither undercuts the urgency with which it sought to protect its business nor establishes any acquiescence as to the Defendants use of its marks, it does not doom its irreparable harm argument here.  Moreover, "courts have held that delay does not require denial of a preliminary injunction 'if . . . the likelihood of confusion is so great that it outweighs the effect of plaintiff's delay in bringing suit.'"  *Marks Org., Inc. v. Joles*, 784 F. Supp. 2d 322, 333 (S.D.N.Y. 2011) (quoting *ProFitness Physical Therapy*, 314 F.3d at 68); *see also ProFitness Physical Therapy*, 314 F.3d at 68.

("Given the strong interest in preventing public confusion . . . a plaintiff's apparent acquiescence or delay in bringing suit does not necessarily bar relief."). As the Court has detailed, the identical infringing products are being marketed to the exact same audience alongside a message that the original products are counterfeit. Coupled with that great possibility of consumer confusion, Plaintiff has adequately demonstrated irreparable harm.

## IV.     Balance of the Equities and the Public Interest

On the balance of the equities, Plaintiff's business is facing immediate and irreparable harm to its legitimate business interests. The likelihood of consumer confusion and potential loss of goodwill and reputation threaten to cause Plaintiff great harm. To the contrary, Defendant is free to sell its product "in different packaging that will avoid confusion between its product and the product of its direct competitor." *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 1005–06 (2d Cir. 1997). Although it may face "economic costs" in doing so, this burden "is quantifiable and compensable," unlike the Plaintiff's loss of goodwill. *Museum of Modern Art*, 339 F. Supp. 3d at 383. Moreover, it is "axiomatic that an infringer . . . cannot complain about the loss of ability to offer its infringing product." *Int' Couns. of Shopping Ctrs., Inc. v. Glob. Infotech LLC*, 2019 WL 2004096, at *5 (S.D.N.Y. May 7, 2019) (quoting *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 287 (2d Cir. 2012)); *US Masters Weightlifting Inc. v. USA Weightlifting, Inc.*, 2026 WL 1045877, at *2 (S.D.N.Y. Apr. 17, 2026) ("it presents no hardship" for a party "to follow the law.").

On the public interest, "[t]he public has an interest in not being deceived—in being assured that the mark it associates with a product is not attached to goods of unknown origin and quality." *N.Y.C. Triathlon*, 704 F. Supp. 2d at 344; *see U.S. Polo Ass'n v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 541 (S.D.N.Y. 2011) ("The consuming public has a protectable

51

interest in being free from confusion, deception, and mistake.")  Protecting Plaintiff's valid trademarks from infringement does not disserve the public interest.

## CONCLUSION

The motion for a preliminary injunction is GRANTED IN PART and DENIED IN PART as further detailed in the accompanying order.  The motion is GRANTED on Plaintiff's trademark infringement and false advertising claims.  The motion is DENIED as to Plaintiff's cybersquatting and trade dress infringement claims.  Defendants are hereby enjoined from using the word and/or design marks for PETMECTIN, PETDAZOLE, FISHCYCLINE, FLAV-X, VIR-X, Virogex, or Virex Health in commerce.  Defendants are further enjoined from falsely advertising that ResolvX is a rebrand of Virogex's Virex Health line, from otherwise claiming that Virogex products are inauthentic or fake, or from representing that ResolvX or its products have any affiliation with Virogex or the Virex Health brand.

The Clerk of Court is respectfully directed to close Dkt. Nos. 19 and 20.

SO ORDERED.

Dated: May 14, 2026
　　　　New York, New York
　　　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　　　　　　LEWIS J. LIMAN
　　　　　　　　　　　　　　　　　　　　　　　　United States District Judge

52